M.V. v J.T. (2024 NY Slip Op 24260)

[*1]

M.V. v J.T.

2024 NY Slip Op 24260

Decided on October 8, 2024

Supreme Court, Nassau County

Kapoor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on October 8, 2024
Supreme Court, Nassau County

M.V., Plaintiff,

against
J.T., Defendant.

Index No. 602511/2024

Sarika Kapoor, J.

Relief Requested
The defendant moves, pre-answer, pursuant to CPLR 3211(g), (a)(1), and (a)(7) to dismiss the complaint. The plaintiff opposes the motion.

Background
"In considering a motion pursuant to CPLR 3211(a)(7) to dismiss a complaint, the court must accept the facts as alleged in the complaint as true, accord the plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory. Moreover, the court may consider affidavits submitted by the plaintiff to remedy any defects in the complaint, and upon considering such an affidavit, the facts alleged therein must also be assumed to be true" (Town of Riverhead v Kar-McVeigh, LLC, 229 AD3d 735, 737-738 [2d Dept 2024] [citations and internal quotation marks omitted]). Accepting the allegations of the complaint and the plaintiff's affirmation as true, the facts are as follows:
The plaintiff, M.V., commenced this action against the defendant, J.T., alleging that this action arises out of a personal vendetta and jealous revenge plot by J.T. to destroy his life and reputation. M.V. asserts that, intent on causing him maximum damage after he finally ended their casual, on-and-off sexual relationship that spanned years including through their time together in college, J.T. knowingly published numerous false and defamatory statements to the social media application YikYak, falsely accusing M.V. of rape and being a pathological liar. M.V. alleges that J.T. also verbally shared these same false accusations with numerous individuals. According to the complaint, J.T.'s emotional attachment to M.V. became clear through her relentless posts to the social media application TikTok, which displayed her state of mind and how she viewed M.V., including that she sought revenge and embraced her [*2]manipulator. M.V. asserts that, in response to J.T.'s defamatory statements, he felt threatened and sought protective measures from Binghamton University (hereinafter the University), which they both attended. M.V. alleges that J.T. went so far as to file a formal complaint against him with the University and, after hearing with live testimony and cross examination, the University exonerated M.V. by finding him not responsible of all allegations. M.V. further alleges that J.T. continues to perpetuate her vendetta against him via social media posts. M.V. alleges that, as a result of J.T.'s false allegations and defamatory statements, he has suffered, and continues to suffer, severe emotional distress, including loss of appetite, insomnia, and lack of concentration in his daily life, as well as damage to his reputation despite full exoneration, a delayed entry into the work force in his chosen field, and delayed receipt of his degree. M.V. alleges that J.T.'s actions will continue to impact him if they are not stopped (Complaint ¶ 1-8).
The complaint and M.V.'s affidavit allege that, in the spring of 2019, M.V., then a senior in high school, and J.T., a year behind him in school, began dating after meeting on Instagram. M.V. made it clear to J.T. that he was not interested in a serious relationship because he would be departing for the University in the fall. The two went their separate ways in July 2019. When M.V. went to college that fall, he and J.T. lost touch, but during Thanksgiving break, the two consensually kissed. M.V. learned that J.T. also planned to attend the University that upcoming fall. J.T. contacted a woman who M.V. was dating at that time, and told the woman that she would be attending the University the next fall and would "make [M.V.]" hers (Complaint ¶ 13-22; M.V. Aff. ¶ 4-9).
Upon return to the University for his sophomore year in the fall of 2020, M.V. knew that J.T. would be attending the same University, as a freshman. M.V. and J.T. reconnected and began to engage in a sexual dating relationship, seeing each other nearly every day, and engaging in sexual activity often. During this time, J.T. asked M.V. whether he would be willing to engage in a type of sexual role play that she saw popularized on social media. Before the parties ever engaged in this role play, they engaged in many discussions on the topic, and established boundaries, general ground rules, and a "safe word." The parties always established consent prior to engaging in the role play and it would often arise when the two were already engaged in sexual activity. J.T. often initiated role play sex, and even clearly indicated a desire to so in text message exchanges (Complaint ¶ 24-37; M.V. Aff. ¶ 10-21).
Upon return to the University for the spring 2021 semester, M.V. found himself spending less time with J.T. and began meeting with a therapist to aid with his mental health. J.T. ended the relationship with M.V. in late January or early February 2021. M.V. wished her well when they parted. Sometime in or around May 2021, J.T. reached out to M.V., and the two engaged in a casual dating relationship, and resumed their sexual relationship, which continued until July 2021. During this time, J.T. did not express that their role play agreement only applied to when they were in a formal relationship but did express that she thought she was M.V.'s future wife (Complaint 38-43; M.V. Aff. ¶ 24-29).
The parties resumed their consensual sexual relationship in the fall and winter of 2021, but only after M.V. first declined J.T.'s request to engage in sexual activity. Throughout November and early December 2021, the parties engaged in consensual sexual activity, including role play sex. Each time, they consensually engaged with each other, in both regular sexual activity and role play sexual activity (Complaint ¶ 44-48; M.V. Aff. ¶ 30-35).
In his affirmation, M.V. asserts that, by way of example and not limitation, the sexual encounters between M.V. and J.T. during this time included: (a) on or around November 4, [*3]2021, M.V. asked whether he could complete inside of J.T. that day, and she responded with a clear "yes"—indicating full consent, and then spent the night with M.V. (M.V. Aff. ¶ 36-38); (b) on November 21, 2021, J.T. asked M.V. to have sex and stated that she would look elsewhere to "get[ ] laid" if it was not with him; however, M.V. and J.T. ultimately did engage in sexual intercourse that evening, with J.T. sleeping over M.V.'s apartment (M.V. Aff. ¶ 41-45); (c) after J.T. contacted M.V. on November 28, 2021, to engage in sex, they did so (M.V. Aff. ¶ 49-51); and, (d) both regular sex and role play sex on or around November or December 2021 (M.V. Aff. ¶ 52).
On or around December 11, 2021, M.V. stopped contacting J.T. because he wanted something more meaningful. A few days later, he noticed his car was vandalized when he went to take a final exam (Complaint ¶ 49-51; M.V. Aff. ¶ 57-59).
M.V. returned home for his winter break of 2021-2022, but that did not stop J.T. from attempting contact, as she penned an anonymous letter to M.V., which M.V. recognized as her handwriting, sharing that he was loved and if he ever needed anything he could reach out. J.T. also sent a series of text messages to M.V., stating that she wished they were engaged in role play sex and wishing him a happy new year (Complaint ¶ 53-56; M.V. Aff. ¶ 64-68).
M.V. and J.T. briefly again reconnected in the spring of 2022. They began talking to each other through text message and then moved their conversation in person. Eventually, they engaged in a casual dating relationship, with regular sexual encounters. It was during this time that M.V. gave J.T. the code to his apartment. The two went their separate ways once again and M.V. began dating another woman (Complaint ¶ 57-59; M.V. Aff. ¶ 69-71).
In the fall of 2022, M.V.'s apartment was broken into by a person in a red hoodie, which M.V. thought was an old sweatshirt of his that J.T. had in her possession. Additionally, although M.V.'s apartment had multiple bedrooms, and only his bedroom had items missing. All items missing from M.V.'s bedroom were of a sentimental nature, except for some cash; the sentimental items included his cat's first collar and a coin from the Smithsonian that he obtained during a trip with his father (Complaint ¶ 60-62; M.V. Aff. ¶ 72-74).
The parties once again reconnected in November 2022, when J.T. shared that she was dissatisfied with her boyfriend at that time. At that same time, M.V., along with the person whom he was dating, mutually decided to go on a break. On December 5, 2022, however, the person whom M.V. had been dating experienced roommate problems, so M.V. offered her a safe place to stay that evening. On the night of December 5, 2022, M.V. and this person did not engage in sexual intercourse. The next day, M.V. and J.T. engaged in consensual sex for the last time. Later that same day, December 6, 2022, the person who needed a safe space to stay while experiencing roommate issues again went to M.V.'s apartment to spend the night, where nothing sexual occurred. J.T. reached out to express her discontent over this via text message and expressly stated that she did not want M.V. spending any time with the other person, at all (Complaint 63-69; M.V. Aff. ¶ 76-81).
On or around January 8, 2023, J.T. posted a video to TikTok that shared the text "embrace the male manipulator in you" (Complaint ¶ 72; M.V. Aff. ¶ 82).
On or around February 11, 2023, M.V. claims that J.T. defamed him while he was out of the country attending a family funeral. M.V. claims, "upon information and belief," that J.T. publicly stated to numerous individuals—including his fraternity brothers and friends— that M.V. allegedly raped her. M.V. adds that, "upon further information and belief," that J.T. posted to YikYak, a social media application, that M.V. allegedly raped her with the words "[M.V.] is a [*4]r*pist" among other posts and follow up posts, which J.T. later admitted in her own affirmation (Complaint ¶ 74-80; M.V. Aff. ¶ 85-89; see J.T. Aff. ¶ 48-52, NYSCEF 8). 
In March 2023, J.T. filed a complaint against M.V. at the University alleging non-consensual sexual contact and "domestic violence or dating violence," which M.V. learned of for the first time in a meeting with the University. On May 23, 2023, M.V., along with his advisor, J.T., and J.T.'s advisor appeared for a University hearing (the "hearing") before a hearing panel. At the hearing, M.V. set forth his innocence of the allegations, including but not limited to the following: (a) M.V. never once stated to J.T. that she allegedly liked being raped by me; (b) M.V. never once called her a bum; (c) M.V. never touched J.T. without her consent while she slept, ever; (d) M.V. never gave J.T. hickeys without her consent; (e) the occasion that J.T. mentioned wherein M.V. allegedly gave her a hickey due to her having a date with another guy never happened; and (f) J.T.'s allegations that M.V. pulled her pants down and covered her mouth were completely false. At the hearing, M.V. set forth instances of how J.T. gave consent, including but not limited to her frequently wrapping her legs around him and pulling him closer. At the hearing, M.V. acted respectfully and cordially towards all participants. J.T., on the other hand, rolled her eyes, openly scoffed, laughed, and shook her head while M.V. spoke at multiple points in the proceeding including his opening and closing statements, and during important periods of question and answer. The hearing chairperson verbally asked J.T. to stop engaging in such behavior; however, she did not (Complaint ¶ 83-90; M.V. Aff. ¶ 94-104).
Additionally, M.V. maintains that, notably, J.T. displayed her lack of credibility at the hearing by contradicting herself several times. For instance: (a) J.T. asserted at the hearing and in her affirmation that role play sex only occurred while "dating." At the hearing, however, she admitted to asking for, and engaging in, role play sex after she and M.V. "dated," which prompted a discussion amongst the parties to establish the comfort and consensual nature of the role play sex; (b) J.T. also admitted that she did not tell her "witness" S.N. about the "specifics" of the role play sex or their sexual encounters in general; (c) J.T. admitted to utilizing sex in an attempt to manipulate M.V.; and, (d) J.T. stated that she would have "loved to be [in a relationship] with [him]" (M.V. Aff. ¶ 107).
Ultimately, the University found M.V. not responsible for any of the allegations against him. J.T.'s claims were determined not to rise to the level of a policy violation under the University policy, which utilizes a preponderance of the evidence standard. With this finding in hand, M.V. sought to move on with his life and ultimately, in October of 2023, through counsel, both parties agreed to vacate orders of protection. Since that time, the parties have not contacted each other (Complaint ¶ 88-90; M.V. Aff. ¶ 109-113).
The complaint asserts three causes of action; (1) defamation per se; defamation; libel per se; libel; (2) defamation per se; defamation; slander per se; slander; and (3) intentional infliction of emotional distress. In the first cause of action, M.V. alleges that J.T. libeled and defamed him in her YikYak post on or around February 11, 2023, where she, upon information and belief, wrote "[M.V.] is a r*pist." M.V. further alleges that J.T. libeled and defamed him in her YikYak posts on or around February 13, 2023, where she, upon information and belief, wrote "[M.V.] in asig is a r*pist"; "we used to have a complicated relationship and he manipulated me to the point where i didn't realize he was r*ping me regularly"; "not just talking coercion, he physically pinned me down, pushed my underwear to the side, & shoved his dick in me as fast as he could while i was pushing away & repeatedly saying no. this was often"; "he's also a pathological liar. people need to know about this." M.V. contends that, when J.T. admitted to making these posts, [*5]she stated, upon information and belief, that she wanted to alert others as to what happened and "make sure" they were "safe." M.V. contended that these statements were false and that J.T. knew they were false. In the second cause of action, M.V. alleges that J.T. slandered and defamed him by spreading false allegations of rape, sexual assault, and of him being a pathological liar to numerous individuals in February 2023 and throughout the investigation. In the third cause of action, M.V. alleges that J.T. intentionally inflicted emotional distress upon him by falsely accusing him of rape, sexual assault, and being a pathological liar.

Motion Seq. 001
J.T. moves, pre-answer, pursuant to CPLR 3211(g), (a)(1), and (a)(7) to dismiss the complaint. In support of the motion, counsel for J.T. asserts that M.V.'s defamation and intentional infliction of emotional distress causes of action fall far short of the heightened pleading standard required by New York's anti-SLAPP statute and must be dismissed. Counsel submits that the anti-SLAPP statute was recently amended specifically to protect "survivors of sexual abuse and others [from] being dragged through the courts on retaliatory legal challenges solely intended to silence them" (New York Bill Jacket, 2020 A.B. 5991, Ch. 250). Defense counsel argues that black letter law establishes that J.T.'s social media posts about sexual assault are protected by the anti-SLAPP law. Defense counsel argues that, to survive a motion to dismiss under that statute, a plaintiff must prove by clear and convincing evidence that defendant acted with "actual malice," i.e., knowingly lied. Counsel contends that, as a matter of law, M.V. fails to plead, let alone prove by clear and convincing evidence, that J.T. knowingly lied. Counsel submits that, in fact, J.T. intended to warn other girls. Defense counsel asserts that this action is precisely the type of "retaliatory legal challenge" that the Legislature sought to sanction, and therefore this Court should dismiss the complaint and award J.T. attorneys' fees and costs as mandated by the anti-SLAPP statute. 
In support of the motion, J.T. submits, inter alia, her own affirmation. J.T. states, among other things, that she made the posts on YikYak because she "wanted to warn other Binghamton female students about becoming romantically or sexually involved with [M.V.] because she wanted to prevent [M.V.] from sexually assaulting others." She further stated that M.V. was "a well-known figure at [the] University due to his involvement in a popular fraternity. I included his fraternity's name in one of my YikYak posts, again to warn other girls at [the] University (many of whom often attended fraternity events and parties)."
In opposition, counsel for M.V. argues that J.T.'s motion to dismiss should be denied because New York's Anti-SLAPP statute is not a "bar" M.V.'s claims, as J.T. engaged in a purposeful, unlawful, and utterly misguided campaign to defame M.V.'s name and character, after the two engaged in an on-and-off casual and dating relationship. Counsel argues that J.T.'s malicious pursuit of branding M.V. as a perpetrator of sexual assault stemmed from her own anger and frustration over their own failed relationship. Counsel argues that should this Court find that New York's Anti-SLAPP statute does apply, M.V.'s claims have a substantial basis in law. Counsel contends that M.V.'s claims for defamation, defamation per se, libel, libel per se, slander, and slander per se, not only have a substantial basis in law but there is also clear and convincing evidence that J.T. acted with actual malice. Counsel argues that M.V.'s claim against J.T. for intentional infliction of emotional distress also has a substantial basis in law because, inter alia, J.T. engaged in conduct that amounted to a deliberate and malicious campaign to [*6]destroy M.V.'s reputation.
In reply, counsel for J.T. asserts that the anti-SLAPP statute requires M.V. to prove that the J.T. acted with actual malice in making the YikYak posts. Defense counsel contends that M.V. has no such evidence, much less the clear and convincing evidence. Counsel contends that M.V. admits that J.T. said she made the social media posts "to alert others as to what happened and 'make sure' others were 'safe.'" Counsel contends that the exhibits to the motion include text messages in the weeks leading up to and reflecting the reasons for her posts: her good-faith, genuine belief that M.V. repeatedly sexually assaulted her, that M.V. had sexually assaulted another girl on multiple occasions, and that M.V. had sex with a 15-year-old girl when he was a freshman in college. According to J.T., her evidence also included a text message on the same day as her YikYak posts contemporaneously explaining that she was motivated by her concern to warn other girls about M.V.'s pattern of abusive conduct. Counsel contends that M.V.'s opposition does not address this evidence. According to the defense counsel, M.V. tries to use speculation and cherry-picked social media messages to recast himself as the victim. Counsel contends that there is no evidence to support M.V.'s fantasy that J.T. was obsessed with him and alleged rape in retaliation for their breakup. According to J.T., she and M.V. had a complicated on-again-off-again relationship and both parties initiated break-ups multiple times. Defense counsel contends that J.T. had no reason to believe that their last break-up in December 2022 would be any different from the previous ones. According to defense counsel, the turning point that motivated J.T. to make the YikYak posts was her discussions with another girl that was involved with the M.V., which caused the J.T. to realize that some of her interactions with M.V. rose to the level of assault, that she was not alone in that experience, and that she wanted to warn other girls to make sure they were safe. Counsel for J.T. contends that it is undisputed J.T. removed the posts within days after posting them and the parties had no contact for over a year. Defense counsel adds that the parties also mutually agreed to withdraw their petitions for orders of protection and, belying M.V.'s claim that he "desired to move forward with [his] life," he instead initiated this baseless and "retaliatory legal challenge[ ] solely intended to silence" a "survivor[ ] of sexual abuse," the precise type of lawsuit the legislature sought to prevent when it expanded the anti-SLAPP statute. Therefore, defense counsel argues, M.V.'s complaint must be dismissed. 

Relevant Law and Discussion
A motion pursuant to CPLR 3211(a)(7) and (g) to dismiss cases involving public petition and participation "shall be granted unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law" (VIP Pet Grooming Studio, Inc. v Sproule, 224 AD3d 78, 85 [2d Dept 2024] [internal quotation marks omitted]). In determining motions pursuant to CPLR 3211(a)(7) and (g), the burden of proof is "flipped" such that "the party moving for dismissal need not establish a procedural or substantive defense on the merits of the action, as otherwise required under other provisions of CPLR 3211, but rather, need only establish that the true nature of the action is one within the scope of anti-SLAPP. The actual burden of proof as to the action's meritoriousness is thereupon shifted in the context of anti-SLAPP immediately to the plaintiff, which is unique" (id. at 83).
In 2020, the New York Legislature enacted amendments to expand the protections of the [*7]anti-SLAPP statute. The definition of "action involving public petition and participation" was expanded to include "a claim based upon (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition" (id. at 84, citing Civil Rights Law § 76-a[1][a]). The statute further provides that the term "public interest" "shall be construed broadly, and shall mean any subject other than a purely private matter" (VIP Pet Grooming Studio, Inc. v Sproule, 224 AD3d at 84).
"Matters of public concern include matters of political, social, or other concern to the community, even those that do not affect the general population. When determining whether content is within the sphere of legitimate public concern, allegedly defamatory statements can only be viewed in the context of the writing as a whole and courts must examine the content, form, and context of the statements. Statements falling into the realm of mere gossip and prurient interest are not matters of public concern nor are publications directed only to a limited, private audience" (Aristocrat Plastic Surgery, P.C. v Silva, 206 AD3d 26, 29-30 [1st Dept 2022] [citations, alterations, and internal quotation marks omitted]).
The Appellate Division, Second Judicial Department (hereinafter the Second Department) recently held that "Facebook . . . qualified as a 'public forum' as that term is used under the anti-SLAPP statute" (Nelson v Ardrey, — AD3d —, —, 2024 NY Slip Op 04147, *2 [2d Dept 2024]). The Second Department explained that "[a]n analysis of the legislative history of the anti-SLAPP statute reveals that the Legislature intended to include Facebook and other social media platforms within the meaning of public forum" (id. at *3). Based on the foregoing, the social media posts at issue here were made in a "public forum" for purposes of the anti-SLAPP statute.
The next step in analyzing J.T.'s motion is determining whether the social media posts at issue here concern "an issue of public interest" or a "purely private matter" (Civil Rights Law § 76-a[1][d]). 
Since the enactment of the 2020 amendments to the anti-SLAPP statute, a number of courts have found that statements accusing an individual of sexual assault were subject to the anti-SLAPP statute (see e.g. LeMos v Uhlir, 2024 NY Misc. LEXIS 3078, *9 [Sup Ct, Westchester County 2024] [holding that social media posts accusing the plaintiff of sexual assault and abuse were matters of public interest where the plaintiff was "a person who is heavily involved in the electronic music industry and nightlife community, who interacts with many other prominent people and organizations, performs in front of crowds, and has influence and connections"]; Coleman v Grand, 523 F Supp 3d 244, 260 [ED NY 2021] [an email regarding the sexual impropriety of the plaintiff, "a prominent musician of interest to the jazz community," and the power dynamics in the music industry "amid the rising tide of public concern over workplace sexual harassment known as the #MeToo movement," were matters of public interest for purposes of New York's anti-SLAPP statute]).
On August 7, 2024, the Second Department held in Nelson v Ardrey (— AD3d —; 2024 NY Slip Op 04147 [2d Dept 2024]) that social media posts accusing the plaintiff of sexual assault did not fall within the ambit of the anti-SLAPP statute. In Nelson, the defendants, Tyshawn Ardrey and Iriana Ardrey, posted a series of responses to a post on the personal Facebook page of the plaintiff, Glennis M. Nelson, alleging that the plaintiff had sexually abused Iriana Ardrey approximately 17 years prior when she was 4 years old (see id. at *1). The Second [*8]Department held that the action, which was to recover damages for defamation per se, was "not subject to the anti-SLAPP statute because the defendants' statements published on the plaintiff's Facebook page concerned 'a purely private matter' and were 'directed only to a limited, private audience'" (id. at *3 [citations omitted]). 
Like the defendants in Nelson, although J.T. "made generic reference to issues of broad public interest, [her] primary focus was not an issue of broad public interest" (id.). Moreover, like the situation in Nelson, the social media posts at issue here are "private allegations of the plaintiff's alleged crimes" (id.). Under these circumstances, and guided by Nelson, it is this Court's determination that J.T.'s social media posts are "not within the sphere of public interest" (id. at *4). Accordingly, those branches of J.T.'s motion which are pursuant to CPLR 3211(a)(7) and (g) to dismiss the first and second causes of action, alleging defamation per se, defamation, libel per se, and libel (first cause of action) and defamation per se, defamation, slander per se, and slander (second cause of action) must be denied.
That branch of J.T.'s motion which is pursuant to CPLR 3211(a)(7) to dismiss the third cause of action, alleging intentional infliction of emotional distress, must be granted. This cause of action is duplicative of the first two causes of action alleging, inter alia, defamation (see Reeves v Associated Newspapers, Ltd., — AD3d —, —; 2024 NY Slip Op 04286, *4 [1st Dept 2024]; Mees v Buiter, 186 AD3d 1670, 1672 [2d Dept 2020]).
The parties' remaining contentions have been considered and do not warrant discussion.

 Conclusion
Based on the foregoing, it is hereby
ORDERED that those branches of the defendant's motion which are pursuant to CPLR 3211(a)(7) and (g) to dismiss the first and second causes of action are DENIED; and it is further,
ORDERED that the branch of the defendant's motion which is pursuant to CPLR 3211(a)(7) to dismiss the third cause of action is GRANTED.
Any requests for relief not specifically granted herein are DENIED.
This shall constitute the decision and order of this Court.
Dated: October 8, 2024
Mineola, New York
E N T E R:
HON. SARIKA KAPOOR, A.J.S.C.